# Com. ex rel. Chew *v.* Carlisle.

[FEBRUARY 5, 1821.]

Unless it clearly appears that a prisoner brought up on *habeas corpus* is entirely innocent, the judge is bound to bail or remand.

A combination is criminal when the act to be done has a necessary tendency to prejudice the public, or to oppress individuals, by unjustly subjecting them to the power of the confederates.

THE relators were brought by habeas corpus before Mr. Justice GIBSON, at the sittings at nisi prius for the city and county of Philadelphia, on the 5th of February, 1821. The return set forth, that the relators were in custody under a commitment from Alderman Barker, on a charge of conspiracy by the oath of a certain Peter Voorhees. It appeared they were master ladies shoemakers, and that they had agreed with each other not to employ any journeyman who would not consent to work at reduced wages: but it also appeared that the object went no further than to reestablish certain rates which had prevailed a few months before, from which, there was reason to believe, the employers had been compelled to depart, by a combination among the journeymen. A motion to discharge, on the ground that a combination to regulate wages is no offence by the common law of Pennsylvania, was now argued by *Brown* and *King* for the relators, and *Scott* and *Dallas* for the commonwealth.

GIBSON, J.— Unless it clearly appears that a prisoner brought up on habeas corpus is entirely innocent, the judge is bound to bail or remand. But difficulty or hesitation as to the law, arising from facts indisputably established, is not that kind of doubt of guilt which justifies in refusing to discharge, where the mind inclines, after full consideration, to pronounce in favour of innocence. On all questions of law, arising in the course of the investigation, the

[ Commonwealth *v.* Carlisle. ]

prisoner is entitled to the benefit of the judge's decision; and although he may regret the necessity of encountering an unsettled principle without the assistance of his brethren; yet, being legally competent, he is bound to meet all questions of law; for he trifles with the rights of the prisoner and the liberties of the citizen, as secured by the habeas corpus act, when from timidity he delegates his functions to another tribunal, and refuses to decide on the only ground on which the prisoner rests his claim to be discharged. The argument then that I am bound to remand if I have the least doubt, holds only as to doubt of the truth of the facts in evidence, with respect to which the commonwealth as well as the prisoner has a right to go before a grand jury, who are the constitutional judges in that particular; but as to refusing to decide necessary questions of law, I have no discretion.

In no book of authority has the precise point before me been decided. *Rex* v. *The Tailors of Cambridge* is found in a book (8 *Mod.* 10) which can claim nothing beyond the intrinsic evidence of reason and good sense apparent in the cases it contains. In the trial of the boot and shoemakers of Philadelphia, there was no general principle distinctly asserted, but the case was considered only in reference to its particular circumstances, and in these it materially differed from that now under consideration. And in the trial of the journeymen cordwainers of New York, the mayor expressly omits to decide whether an agreement not to work, except for certain wages, would be indictable *per se.* There are, indeed, a variety of British precedents of indictments against journeymen for combining to raise their wages; and precedents rank next to decisions as evidence of the law; but it has been thought sound policy in England to put this class of the community under restrictions so severe, by statutes that were never extended to this country, that we ought to pause before we adopt their law of conspiracy, as respects artisans, which may be said

[ Commonwealth *v.* Carlisle. ]

to have, in some measure, indirectly received its form from the pressure of positive enactment, and which therefore may be entirely unfitted to the condition and habits of the same class here. An investigation of the principles of the law which declares the offence, then, becomes absolutely necessary to a correct decision in this particular instance; and I at once proceed to it: whether there are not questions of fact proper for the consideration of a jury, as being material to the relators' defence, may, in case I find myself bound to remand them, be a fit question for consideration.

The unsettled state of the law of conspiracy has arisen, as was justly remarked in the argument, from a gradual extension of the limits of the offence; each case having been decided on its own peculiar circumstances, without reference to any pre-established principle. When a combination had for its direct object to do a criminal act; as to procure the conviction of an innocent man (the only case originally indictable, and which afterwards served as a nucleus for the formation of the entire law of the subject) the mind at once pronounced it criminal. So where the act was lawful, but the intention was to accomplish it by unlawful means; as where the conviction of a person known to the conspirators to be guilty, was to be procured by any abuse of his right to a fair trial in the ordinary course. But when the crime became so far enlarged as to include cases where the act was not only lawful in the abstract, but also to be accomplished exclusively by the use of lawful means, it is obvious that distinctions as complicated and various as the relations and transactions of civil society, became instantly involved, and to determine on the guilt or innocence of each of this class of the cases, an examination of the nature and principles of the offence became necessary. This examination has not yet been very accurately made; for there is in the books an unusual want of precision in the terms used to describe the distinctive fea-

tures of guilt or innocence. It is said the union of persons in one common design is the gist of the offence: but that holds only in regard to a supposed question of the necessity of actual consummation of the meditated act; for if combination were, in every view, the essence of the crime, it would necessarily impart criminality to the most laudable associations. It is said in Leach's note to Hawkins, b. i, ch. 72, § 3, that the conspiracy is the gist of the charge, and that to do a thing lawful in itself by conspiracy, is unlawful; but that is begging the very question, whether a conspiracy exists, and leaves the inquiry of what shall be said to be doing a lawful act by conspiracy, as much in the dark as ever. Mr. Chitty, in his Criminal Law, (vol. iii, page 1139,) the best compilation on the subject extant, very truly says, there are many cases in which an act would not be cognizable by law, if done by an individual, that would, nevertheless, be the subject of an indictment if effected by several with a joint design: yet he, too, says the offence depends on the unlawful agreement, and not on the act which is to follow it: the act when done being but evidence of the agreement. From this it might be inferred that the act can operate only to show that an agreement of some sort has taken place, but not by its nature or object to stamp the character of guilt on it; but Chitty himself admits that it is impossible to conceive a combination, merely as such, to be illegal. It will therefore be perceived that the motive for combining, or, what is the same thing, the nature of the object to be attained as a consequence of the lawful act is, in this class of cases, the discriminative circumstance. Where the act is lawful for an individual, it can be the subject of a conspiracy, when done in concert, only where there is a direct intention that injury shall result from it, or where the object is to benefit the conspirators to the prejudice of the public or the oppression of individuals, and where such prejudice or oppression is the natural and necessary con-

[ Commonwealth v. Carlisle. ]

sequence. To give appropriate instances respectively re-
ferable to each branch of this classification of criminal in-
tention:—if a number of persons should combine to estab-
lish a ferry, not from motives of public or private utility,
but to ruin or injure the owner of a neighbouring ferry, the
wickedness of the motive would render the association
criminal, although it is otherwise where capital is combined,
not for the purposes of oppression, but fair competition
with others of the same calling. So with respect to the
other branch: if the bakers of a town were to combine to
hold up the article of bread, and by means of a scarcity
thus produced, extort an exorbitant price for it, although
the injury to the public would be only collateral to the ob-
ject of the association, it would be indictable; and to one
or other of these, may the motive in every decided case be
traced. Thus a combination to marry, under feigned
names, was criminal, because the object was to affect the
interest of a particular parish under the poor laws, or to
injure an individual by setting up a colourable title to his
estate; an agreement between the officers of an army to
throw up their commissions simultaneously, in a time of
public danger, or between a number to hiss a play, right or
wrong, was indictable; because there was an unmixed
motive of mischief to the public or an individual. So, on
the other hand, in a confederacy to raise the price of the
funds, to sell bad liquors, or to procure the release of a
prisoner by entering insufficient bail, the motive is not pre-
judice to the public or an individual, but undue gain to the
confederates or their friends; which is unlawful only in
reference to the means used to procure it. I take it, then,
a combination is criminal wherever the act to be done has
a necessary tendency to prejudice the public or to oppress
individuals by unjustly subjecting them to the power of the
confederates, and giving effect to the purposes of the lat-
ter, whether of extortion or mischief. According to this
view of the law, a combination of employers to depress the

[ Commonwealth *v.* Carlisle. ]

wages of journeymen below what they would be, if there was no recurrence to artificial means by either side, is criminal. There is between the different parts of the body politic a reciprocity of action on each other, which, like the action of antagonizing muscles in the natural body, not only prescribes to each its appropriate state and condition, but regulates the motion of the whole. The effort of an individual to disturb this equilibrium can never be perceptible, nor carry the operation of his interest on that of any other individual, beyond the limits of fair competition; but the increase of power by combination of means, being in geometrical proportion to the number concerned, an association may be able to give an impulse, not only oppressive to individuals, but mischievous to the public at large; and it is the employment of an engine so powerful and dangerous, that gives criminality to an act that would be perfectly innocent, at least in a legal view, when done by an individual. The combination of capital for purposes of commerce, or to carry on any other branch of industry, although it may in its consequences indirectly operate on third persons, is unaffected by this consideration, because it is a common means in the ordinary course of human affairs, which stimulates to competition and enables men to engage in undertakings too weighty for an individual. It would, I grant, be impossible for the employers in any branch of manufactures to produce a permanent depression of wages, because others would find it their interest to embark in the business on more liberal terms; and these, by a just compensation for labour, would have a monopoly of all the journeymen—they would ultimately ruin those who should adhere to the system of depression. The competition of interest must eventually break up every combination of the kind. But though every plan of coercion must recoil on those who put it in practice, it may occasion much temporary mischief to others. The journeymen are compelled to enter, with their employers, into "the

D

unprofitable contest of who can do the other most harm," or submit to work for such prices as the latter may choose to give. Hence, precisely the same oppressive consequences to this class, as would result to the community from a confederacy among the bakers to extort an exorbitant price for bread, which every one will acknowledge to be indictable. The labouring classes purchase their bread with their labour, or, what is the same thing, they give their labour for the money with which they purchase bread, and it is evident the more labour is depreciated, the more of it will be required to purchase any given quantity of bread. It must be evident therefore, that an association is criminal when its object is to depress the price of labour below what it would bring, if it were left without artificial excitement by either masters or journeymen, to take its chance in the market. But the motive may also be as important to avoid, as to induce an inference of criminality. The mere act of combining to change the price of labour is, perhaps, evidence of impropriety of intention, but not conclusive; for if the accused can show that the object was not to give an undue value to labour, but to foil their antagonists in an attempt to assign to it, by surreptitious means, a value which it would not otherwise have, they will make out a good defence. In the trial of the journeymen shoemakers of Philadelphia, the recorder, a lawyer of undoubted talents, instructed the jury that it was " no matter what the defendants' motives were, whether to resist the supposed oppression of their masters, or to insist upon extravagant wages;" but this, although perfectly true as applicable to that case, where the combination was intended to coerce not only the employers but third persons, is not of universal application. A combination to resist oppression, not merely supposed but real, would be perfectly innocent: for where the act to be done and the means of accomplishing it are lawful, and the object to be attained is meritorious, combination is not conspiracy. It

[ Commonwealth *v.* Carlisle. ]

is a fair employment of means not criminal in the abstract, but only so when directed to the attainment of a criminal object; and it is therefore idle to say the law affords a remedy to which the parties must recur: the legal remedy is cumulative, and does not take away the preventive remedy by the act of the parties. It would be an assumption of the question to say it is criminal to do a lawful act by unlawful means, when the object must determine the character of the means. It must therefore be obvious that the point in this case is, whether the relators have been actuated by an improper motive; and that, being a question purely of fact, I am bound to refer its decision to a jury, the constitutional tryers of it; but as I was necessarily led into an examination of principles that might have an unfavourable operation on the relators, I owed it to them, particularly as there was some evidence of combination on the part of the journeymen who prosecute, to state also those principles that may possibly operate in their favour; so that the cause may go before the proper tribunal unprejudiced by any observations of mine. In the mean time I am bound to remand them.

On hearing this decision, the relators applied to be discharged on entering into recognizance for their appearance at the next session of the mayor's court, and the counsel for the commonwealth consenting, they were accordingly bound in $200 each.